RECEIVED
U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

JUN 1 8 2024

DANIEL J. McCOY, CLERK
BY:

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 3:24-CR-00120-01 |
| | * | Chief Judge Doughty |
| | * | Magistrate Judge McClusky |
| | * | 18 U.S.C. § 1349 |
| VERSUS | * | 18 U.S.C. § 1347 |
| | * | 18 U.S.C. § 2 |
| | * | |
| MICHAEL L. RIGGINS | * | |

### INDICTMENT

THE GRAND JURY CHARGES:

**AT ALL TIMES HEREIN RELEVANT:**

### The Medicare Program

1. The Medicare Program ("Medicare") was a federal health insurance program, affecting commerce, that provided benefits to persons who were 65 years of age and older or disabled. Medicare was administered by the United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services.

2. Medicare was a "health care benefit program" within the meaning of Title 18, United States Code, Section 24(b).

3. Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each beneficiary was given a unique Medicare identification number.

4. As part of the Medicare enrollment process, health care providers ("providers") who provided items or services to beneficiaries submitted enrollment applications to Medicare. The Medicare provider enrollment application, CMS Form 855B, required a provider, or an authorized representative of the provider, to certify that the provider would comply with all Medicare-related laws, rules, and regulations, including that the provider "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" and "w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

5. If Medicare approved a provider's application, Medicare assigned the provider a Medicare provider number. A provider with a Medicare provider number could submit claims to Medicare to obtain reimbursement for medically necessary items and services rendered to beneficiaries. Medicare providers were given access to Medicare manuals and service bulletins describing procedures, rules, and regulations.

6. When seeking reimbursement from Medicare, providers submitted the cost of the service provided together with the appropriate "procedure code," as set forth in the Current Procedural Terminology Manual or the Healthcare Common Procedure Coding System.

7. Medicare included coverage under component parts. Medicare Part B covered, among other things, medical items that were reasonable and medically necessary.

### Durable Medical Equipment

8. Durable medical equipment ("DME") was reusable medical equipment such as orthotic devices and pneumatic compression devices ("PCDs"). Orthotic devices were a type of DME that included knee braces, back braces, shoulder braces, and wrist braces. PCDs were an inflatable garment with an accompanying electrical pneumatic pump that filled the garment with compressed air. DME was covered by Medicare under Part B.

9. Medicare would pay claims for the provision of DME only if the equipment was ordered by a licensed provider, was reasonable and medically necessary for the treatment of a diagnosed and covered condition, and was actually provided to beneficiaries. PCDs were medically necessary when prescribed to treat lymphedema or chronic veinous insufficiency with venous stasis ulcers. In addition to the required diagnoses, an unsuccessful trial of conservative therapy had to be documented in the beneficiary's medical records before prescribing any type of PCD. If the above requirements were not met, a claim for supplying a PCD was not eligible for reimbursement and Medicare would deny the claim as not reasonable and medically necessary.

10. Medicare prohibited DME suppliers from directly soliciting beneficiaries when supplying Medicare-covered items absent certain circumstances.

### The Defendant and Relevant Entities

11. The defendant, **Michael L. Riggins**, was a resident of Ouachita Parish, Louisiana. **Riggins** was the owner of Bluewater Healthcare, LLC ("Bluewater"), a

Louisiana limited liability company doing business in West Monroe, Louisiana, in the Western District of Louisiana. Bluewater operated as a DME supply company, and it submitted claims to Medicare for DME supplied to beneficiaries. **Riggins** was also the owner of Magnolia Healthcare, LLC dba Therapeutic Healthcare ("Magnolia"), a Louisiana limited liability company doing business in West Monroe, Louisiana, in the Western District of Louisiana. Magnolia operated as a DME supply company, and it submitted claims to Medicare for DME supplied to beneficiaries.

12. Company 1 was a North Carolina limited liability company owned and operated by Co-Conspirator 1. Company 1 purported to provide marketing/call center services that generated "raw lead data" for DME suppliers.

13. Company 2 was a North Carolina limited liability company owned and operated by Co-Conspirator 1 that held itself out as a marketing company that sold doctors' orders for DME.

14. Company 3 was a North Carolina limited liability company owned and operated by Co-Conspirator 1 that provided billing services for companies submitting claims to Medicare and other health care benefit programs.

15. Co-Conspirator 2 was a resident of Yadkinville, North Carolina.

## COUNT 1
### Conspiracy to Commit Health Care Fraud
### [18 U.S.C. § 1349]

16. Paragraphs 1 through 15 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

17. Beginning in or around January 2018, and continuing through in or around December 2023, in the Western District of Louisiana and elsewhere, the defendant, **Riggins**, did knowingly and willfully conspire and agree with others known and unknown to the Grand Jury, to execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), namely, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owed by, and under the custody and control of, Medicare, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

## Purpose of the Conspiracy

18. It was a purpose of the conspiracy for **Riggins** and his co-conspirators, both known and unknown to the Grand Jury, to unlawfully enrich themselves by: (a) shipping and delivering medically unnecessary DME to beneficiaries; (b) submitting and causing the submission of false and fraudulent claims to Medicare, including for items purportedly rendered to beneficiaries located in the Western District of Louisiana and elsewhere; (c) receiving and obtaining the reimbursements paid by Medicare based on the false and fraudulent claims submitted; (d) concealing the submission of false and fraudulent claims to Medicare; and (e) diverting proceeds of the fraud for the personal use and the benefit of the defendant and his co-conspirators.

## Manner and Means of the Conspiracy

19. The manner and means by which **Riggins** and his co-conspirators sought to accomplish the objects and purpose of the scheme included, among others, the following:

20. In or around 2018, **Riggins** enrolled Bluewater in Medicare. In doing so, **Riggins** certified to Medicare that he would comply with all Medicare rules and regulations, including that he would not knowingly present or cause to be presented a false or fraudulent claim for payment to Medicare, or submit or cause to be submitted claims with deliberate ignorance or reckless disregard of their truth or falsity. **Riggins**, through Bluewater, received education on Medicare rules and regulations and federal laws, including Medicare's requirement of medical necessity, and prohibitions on fraud, waste, and abuse.

21. **Riggins** also served as Bluewater's compliance officer and maintained a "compliance plan." In the plan, **Riggins**, as compliance officer, would, among other things, "make an effort to detect and correct . . . falsification of Certificates of Medical Necessity."

22. Shortly after enrolling Bluewater in Medicare, **Riggins** was notified by the Board of Certification/Accreditation, a national organization for DME suppliers, that it was aware **Riggins** consulted with an individual during the enrollment process who was indicted for engaging in health care fraud. The Board advised **Riggins** to "evaluate [his] vendor and marketing agreements and confirm that all conduct falls within the legal parameters established by [CMS]." Despite the

certification to Medicare, his duties as compliance officer, and the warning from the Board of Certification/Accreditation, from in or around January 2018 through in or around December 2023, **Riggins**, through Bluewater, knowingly and willfully executed a five-year scheme to submit millions of dollars in false and fraudulent claims to Medicare for medically unnecessary DME, including for beneficiaries located in the Western District of Louisiana and elsewhere.

23. The fraudulent orders for DME, to include PCDs, were based on information derived from telemarketing and in-person solicitations of beneficiaries. Companies 1 and 2 contracted with telemarketing and other companies to purchase the beneficiary information gained through the solicitations and generated doctors' orders for DME, which they sold to DME supply companies such as Bluewater. The representatives from these telemarketing companies, who had no medical training, obtained the beneficiaries' names, unique Medicare identification numbers, and medical history, which, Companies 1 and 2, in turn, used to populate the DME orders.

24. Regarding PCDs, as **Riggins** knew, often the call center representatives would simply ask if the beneficiaries had pain or swelling in their legs. The call center representatives would not ask questions regarding diagnoses for lymphedema or chronic veinous insufficiency with ulcers nor have any discussion of whether the beneficiaries were unresponsive to other clinical treatment as required by Medicare.

25. **Riggins** nevertheless purchased the pre-populated doctors' orders for DME from Companies 1 and 2, which formed the basis of the fraudulent billing.

26. Further, **Riggins** and his co-conspirators developed and implemented a "doctor chase" model in order to trick physicians into signing the DME orders and supporting documentation. To effectuate the "doctor chase," Bluewater employees, at **Riggins's** direction, persistently and aggressively faxed the DME orders, along with purported "certificates of medical necessity," which were created by **Riggins** and his co-conspirators, to a beneficiary's primary care physician until the physician completed the forms. The forms often contained false and misleading language, including that the beneficiary had "requested that [Bluewater] send [the PCDs]" in order to "help them overcome the discomfort they experience during their day-to-day activities," in order to make the forms appear legitimate, even though the statements were often untrue.

27. Upon receipt of the signed DME orders and false certificates of medical necessity from the beneficiaries' primary care physicians, **Riggins** and his co-conspirators directed Company 3 to submit false and fraudulent claims to Medicare for the medically unnecessary DME on behalf of Bluewater.

28. In order to perpetuate the fraud, **Riggins** used his position as compliance officer to ensure that billing continued despite numerous beneficiary complaints and attempts to return the DME. Specifically, between 2018 and 2021, Bluewater maintained spreadsheets of complaints, which documented hundreds of complaints, including from beneficiaries who disputed ordering the DME, returned the DME on advice of their primary care physicians, or, on at least one occasion, complained about receiving a PCD for a leg that had been amputated.

29. Not only did **Riggins** continue billing Medicare for supplying unnecessary DME despite the complaints, but, in order to further the fraud, when beneficiaries attempted to return their DME, **Riggins** implemented a call script, including a proposed response to the question, "My Dr did not prescribe this and this is fraud," wherein employees were directed to tell the beneficiaries, "I have the prescription in front of me, we only provide items by prescription only." If the patient still insisted on returning the item, the employee was to respond, "Ok, I will have to get approval from my manager and call you back."

30. Further, starting in or around 2019, **Riggins**, through Bluewater, received numerous education letters from Medicare and other insurers regarding the lack of medical necessity for the claims submitted by Bluewater for DME. In response to this increased scrutiny in 2020, **Riggins** did not change his billing practices. Instead, to conceal and further the fraud, **Riggins** opened a new company, Magnolia, citing the need to have a new DME supply company in the event that Medicare shut down Bluewater. **Riggins**, through Magnolia, again contracted with Company 1 to purchase DME orders and Company 3 for billing services.

31. In total, **Riggins** and his co-conspirators caused the submission, through Bluewater and Magnolia, of at least $3.8 million in false and fraudulent claims to Medicare for PCDs, that were ineligible for Medicare reimbursement because the PCDs were not medically necessary. Of these claims, Medicare reimbursed Bluewater and Magnolia over $1.8 million.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-5
## Health Care Fraud
## [18 U.S.C. §§ 1347 and 2]

32. Paragraphs 1 through 31 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

33. Beginning in or around January 2018, and continuing through in or around December 2023, in the Western District of Louisiana and elsewhere, the defendant, **Riggins**, in connection with the delivery and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, and aided and abetted others in executing, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), namely, Medicare, and to obtain, by mean of materially false and fraudulent pretenses, representations, and promises, money owed by, and under the custody and control of, Medicare.

### Purpose of the Scheme

34. The purpose of the scheme is more fully described in paragraph 18 of this Indictment and is re-alleged and incorporated by reference as though fully set forth herein.

### Manner and Means

35. The manner and means of the scheme are more fully described in paragraphs 19 through 31 of this Indictment and are re-alleged and incorporated by reference as though fully set forth herein.

### Acts in Execution of the Scheme

36. On or about the dates and in the approximate amounts set forth below, within the Western District of Louisiana, **Riggins**, for the purpose of executing and attempting to execute the fraudulent scheme described above, knowingly and willfully submitted, and caused to be submitted, to Medicare, the following false and fraudulent claims for payment, with each execution set forth below forming a separate count:

| Count | Beneficiary | Approx. Claim Date | Description of Claim | Approx. Amount Billed |
|---|---|---|---|---|
| 2 | S.W. | 10/24/2019 | Pneumatic compression device with two leg sleeves | $2,568.68 |
| 3 | T.G. | 2/20/2020 | Pneumatic compression device with two leg sleeves | $2,568.68 |
| 4 | N.J. | 3/3/2020 | Pneumatic compression device with two leg sleeves | $2,568.68 |
| 5 | P.W. | 3/17/2021 | Pneumatic compression device with two leg sleeves | $2,568.68 |

Each of the above in violation of Title 18, United States Code, Sections 1347 and 2.

### Notice of Forfeiture

37. Paragraphs 1 through 36 of this Indictment are incorporated herein by reference as factual allegations.

38. Upon conviction of the offense alleged in Counts 1 through 5 of this indictment, the defendant, **Riggins**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, which constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of said offenses.

39. If any of the above-described property, as a result of any act or omission of the defendant:

> a. cannot be located upon the exercise of due diligence;
> 
> b. has been transferred or sold to, or deposited with, a third party;
> 
> c. has been placed beyond the jurisdiction of the Court;
> 
> d. has been substantially diminished in value; or
> 
> e. has been comingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States to seek forfeiture money judgment and, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to a value of the forfeitable property described above.

A TRUE BILL:

**REDACTED**

_____
GRAND JURY FOREPERSON

BRANDON B. BROWN
United States Attorney

_/s/ Samantha Usher_____
BRIAN FLANAGAN, La Bar No 35125
Assistant United States Attorney
300 Fannin Street, Suite 3201
Shreveport, Louisiana 71101
Telephone: (318) 676-3600

GLENN S. LEON
Chief
Criminal Division, Fraud Section
United States Department of Justice

_/s/ Samantha Usher_____
SAMANTHA USHER, MA Bar No 696951
KELLY Z. WALTERS, D.C. Bar No 1023492
Trial Attorneys
Criminal Division, Fraud Section
United States Department of Justice
1400 New York Ave., NW
Washington, DC 20005
Telephone: (202) 579-7787